UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK
_____

MICHAEL W. OLDFIELD,
AMY L. OLDFIELD,

                      Plaintiffs,

                                                                  DECISION AND ORDER

                                                                  06-CV-6487L

                      v.

VILLAGE OF DANSVILLE,
LIVINGSTON COUNTY,
DEBORAH BABBITTS,

                      Defendants.
_____

Plaintiffs, Michael and Amy Oldfield ("the Oldfields"), brought this action under 42 U.S.C. § 1983 against Livingston County, New York ("County"), the villages of Dansville and Wayland, both of which are in Livingston County, and one individual, Deborah Babbitt, who at all relevant times was the Code Enforcement Officer ("CEO") for both Dansville and Wayland. Plaintiffs, who reside in Dansville, own about a dozen rental properties in Livingston and nearby counties, including some properties in Dansville. They allege that defendants have violated their constitutional rights in connection with certain incidents involving Dansville's municipal code provisions relating to rental properties.

In October 2008, the Court issued a Decision and Order, familiarity with which is assumed, granting summary judgment in favor of the Village of Wayland. 583 F.Supp.2d 440. The County has now moved for summary judgment as well. For the reasons that follow, the County's motion is granted, and plaintiffs' claims against the County are dismissed.

**FACTUAL BACKGROUND**

Plaintiffs allege that since 2001, they have had a number of problems and disputes with defendants regarding plaintiffs' rental properties in Dansville. Plaintiffs allege they have been subject to unwarranted inspections and condemnations of their property without proper notice, as well as interference by the Village of Dansville ("Dansville" or "the Village") and the County with plaintiffs' actual and prospective tenants.

Much of the friction between the parties relates to Dansville's "Certification of Building Code Compliance Local Law #3" ("Code Compliance Law"), which, according to plaintiffs, requires an owner of real property in Dansville to submit to a "warrantless code enforcement inspection" after tenants vacate a property, and issuance of a Certificate of Compliance ("COC") by the Dansville CEO, before new tenants can occupy the apartment. Complaint (Dkt. #42) ¶ 16. The Code Compliance Law was passed in 1992 and amended in 2004 to include provisions for criminal prosecution and fines for violations of the law. Complaint ¶¶ 17, 18.[1]

In early May 2004, Babbitt, in her capacity as Dansville CEO, charged Michael Oldfield with violations of several provisions of the Code Compliance Law. The charges were based on an allegation that a new tenant had moved into a building owned by Oldfield in Dansville and that he had not requested or obtained a prior COC for that property from the Village. Dkt. #78, Ex. X. Plaintiffs allege that the charges were unwarranted and that other property owners were not charged with violations in similar circumstances. In July 2004, Oldfield was granted a conditional discharge of the charges against him. Complaint ¶ 23.

In late August or early September 2004, Oldfield complained to the Village that the Code Compliance Law was unconstitutional under *Sokolov v. Village of Freeport*, 52 N.Y.2d 341 (1981).

---

[1] Unless otherwise noted, references to the complaint are to the most recently filed complaint, which is denominated the "Second Amended and Supplemental Verified Complaint," and which was filed on September 11, 2007. Dkt. #42.

In *Sokolov*, the New York Court of Appeals held unconstitutional a village ordinance which provided that no one could rent a property within the village without obtaining a permit from the village, and which required landlords to submit to inspections after any tenant moved in or out and before the property could be bought or sold. The ordinance also provided for criminal penalties for its violation.[2] Plaintiffs allege that on September 9, 2004, the Village, relying on faulty information or bad advice that it had received from Babbitt, informed Oldfield (incorrectly) that *Sokolov* had been overturned, and that his arguments were therefore in error.

Plaintiffs allege that after Michael Oldfield made this challenge to the constitutionality of the Code Compliance Law, the Village and Babbitt retaliated against him in a number of ways, such as by charging him with violations of the Code Compliance Law, conducting warrantless searches of his properties, denying various permit applications that he had submitted to the Village, and so on. Plaintiff also alleges that at some point after this lawsuit was filed, the Village repealed the criminal enforcement provisions of the Code Compliance Law. Dkt. #42 ¶ 29.

Plaintiffs' allegations concerning the County generally relate to two entities, the County's Office of Housing Assistance ("OHA") (referred to in the complaint as the County Housing Administration) and the County Department of Social Services ("DSS"). Plaintiffs allege that OHA was the local administrator of the New York State Section 8 housing assistance program for low-income households, and that OHA required plaintiffs to submit to and comply with local code requirements as a condition of OHA's approval of contracts for financial assistance for prospective tenants. Plaintiffs allege that this virtually forced them to submit to warrantless searches of their properties if they wanted to obtain approval for Section 8 tenants.

---

[2]The court in *Sokolov* stated that "[s]ince the governmental purpose behind the search would not be frustrated by the burden of obtaining a warrant, and because administrative searches ... involved significant intrusions ... such searches could not be made without the owner's consent unless a search warrant had first been obtained." *Id.* at 345. The court further held that even if an ordinance does not explicitly require warrantless searches, it is nonetheless unconstitutional if it effectively requires a warrantless search as a condition of obtaining a rental permit. *Id.*

The complaint also alleges that the County "did not require other owners of residential rental property within the county to obtain a certificate of compliance before approving contracts for rental assistance." Dkt. #42 ¶ 51. The complaint identifies three other owners of rental property–David and Barbara Oldfield (who are Michael Oldfield's parents) and Gene Jackson–who allegedly were not subjected to this requirement.

As to DSS, plaintiffs allege that it had a policy of requiring a COC before it would approve applications for temporary assistance for DSS clients seeking to rent in Dansville. Plaintiffs allege that this policy was only applied in the Village of Dansville and the Town of North Dansville, although it is not clear from the complaint if any other municipalities in Livingston County had similar code compliance requirements and procedures in place. Plaintiffs contend that this policy also caused them to be subjected to warrantless searches of their properties if plaintiffs wanted to rent to persons who received or needed assistance from DSS.

The complaint contains twenty causes of action, four of which were asserted only against the Village of Wayland and which were dismissed pursuant to the Court's October 2008 Decision and Order. Of the remaining sixteen causes of action, five are brought against Livingston County.

Plaintiffs' equal protection claim against the County alleges that the County treated other similarly situated rental property owners differently from plaintiffs, in order to punish plaintiffs for the exercise of their rights, or out of malice or a bad faith intent to injure plaintiffs. Dkt. #42 ¶¶ 89-93. Plaintiffs also assert a claim alleging that plaintiffs had property interests in their rental properties, and that the County has deprived plaintiffs of their property without due process of law. Dkt. #42 ¶¶ 106-09.

In addition, plaintiffs assert that the County has violated their rights under the First and Fourth Amendments to the United States Constitution. The First Amendment claim is based on Michael Oldfield's complaints to the Village about the *Sokolov* issue. Plaintiffs allege that the County retaliated against them because of Oldfield's exercise of his First Amendment rights, by insisting that he obtain a COC before OHA or DSS would approve or provide financial assistance

to any tenants. Dkt. #42 ¶¶ 125-31, The Fourth Amendment claim alleges that County's actions violated plaintiffs' right to be free from unreasonable searches. Dkt. #42 ¶¶ 138-40. The fifth claim against the County does not state a separate cause of action, but simply incorporates by reference all of the allegations that precede it, and alleges that the County's actions were taken under color of state law, in violation of 42 U.S.C. § 1983. Dkt. #42 ¶¶ 155-57.

The County has also asserted a counterclaim against plaintiffs. The County alleges that plaintiffs owe it over $12,000 in security deposits that were paid by the County on behalf of its Section 8 clients. Plaintiffs have cross-moved for summary judgment dismissing this counterclaim, but plaintiffs' counsel has stated in a letter to the Court that plaintiffs wish to withdraw that motion. There is a dispute between plaintiffs and the County concerning the withdrawal of this motion, which will be discussed later in this Decision and Order.

## DISCUSSION

**I. The County's Motion for Summary Judgment**

After reviewing the record, I conclude that the County is entitled to summary judgment dismissing plaintiffs' claims against it. The acts that give rise to plaintiffs' claims were taken by the Village and Babbitt, not by the County, and there is no evidence that the County played any role in any of the alleged violations of plaintiffs' rights. To the extent that the County has taken any actions toward plaintiffs, none of those actions gives rise to a valid constitutional claim against the County.

There are numerous defects with plaintiffs' claims against the County. For one thing, it was the Village, not the County, that enacted and enforced the Code Compliance Law, the source of the dispute that led to this lawsuit. That ordinance provides that "[n]o owner of property ... shall permit his property to be occupied by another" unless the dwelling is in habitable condition, "as certified in advance of such occupancy through a Certificate of Compliance" issued by the Dansville CEO. Dkt. #78 Ex. X at 1. It further provides that when a dwelling unit is vacated by the tenant, "[i]n no

event can said dwelling unit be rented to a new or different tenant(s) until a Certificate of Compliance has been issued by the Code Enforcement Officer." *Id.*

Plaintiffs, then, could not legally have rented out their Dansville properties at all without a valid COC, regardless of whether the tenant was receiving assistance from the County. That was the Village's, not the County's, requirement.

In support of their claim against the County, plaintiffs have submitted a copy of an internal DSS memo instructing staff members that "[w]hen a client asks for a security deposit for a rental housing unit in the Village of Dansville only, please tell them that a copy of the Certificate of Compliance for the unit is required before any money can be issued." The memo also states that "[t]his process will ensure that clients are not moving into substandard housing in Dansville, and also will support the efforts that Ms. Babbitt is making toward improving the living conditions there." Dkt. #78 Ex. H.

Contrary to plaintiffs' assertions, this does not show that the County was working hand in glove with the Village to *enforce* the Code Compliance Law. If a client was unable to obtain a copy of the COC for a rental unit in Dansville, plaintiffs would not have been penalized in any way by the County. The only result would have been that DSS would not release any funds for use as rent or a security deposit for the client's rental of the property.

Furthermore, it is hardly remarkable that DSS would not have wanted to release funds so that a client could move into a property that was in violation of local code provisions concerning minimum housing standards. That DSS wanted to avoid providing assistance to allow clients to rent properties that were not in compliance with local governmental standards does not amount to the County's "enforcement" of Dansville's Code Compliance Law.

An additional problem stems from the fact that, when the County did authorize the release of funds in connection with these properties, it was for the benefit of the *client*, to enable the client to move into the property. *See*, *e.g.*, Dkt. #88-5 Ex. B. Because those funds were intended for the benefit of the DSS client, however, plaintiffs lack standing to assert the clients' rights or interests

in those benefits. *American Fed'n of Gov't Employees, Local 2119 v. Cohen*, 171 F.3d 460, 469 (7th Cir. 1999) (stating that "intended beneficiaries of statutory provisions have standing to enforce them," and that "plaintiffs who are only incidentally benefitted ... do not pass the test" for standing); *see also Roth v. City of Syracuse*, 96 F.Supp.2d 171, 183 (N.D.N.Y. 2000) ("To the extent that plaintiffs rely on the legal rights of minority tenants who might have rented apartments from them had they not been suspended from the housing program, it is doubtful whether plaintiffs have standing under the Fair Housing Act to make this claim"), *aff'd*, 4 Fed.Appx. 86 (2d Cir. 2001).

To the extent that plaintiffs' claims relate to OHA and the Section 8 program, it is worth noting that plaintiffs were not forced or required to participate in that program in the first place. The Section 8 program, which is a federal program administered through states and local municipalities, *see* 42 U.S.C. § 1437f, is entirely voluntary. If a landlord chooses to participate in the program, however, the landlord must consent to inspections of his rental unit so that the relevant agency can determine if the properties meet federal housing quality standards. *See* 42 U.S.C. § 1437f(o)(8)(A); Dkt. #74-2 Ex. C. Mr. Oldfield testified at his deposition that he did enter into a Section 8 contract. Oldfield Depo. Tr. (Dkt. #74-1 Ex. A) at 582.

Contrary to plaintiffs' allegations, then, the County did not force plaintiffs to submit to warrantless searches; the County, in its role as administrator of the federal Section 8 program, simply required landlords who sought voluntarily to participate in the program to agree to allow their properties to be inspected, as a condition of their participation. That was both mandated by federal regulations, and quite reasonable as a means to ensure that the properties being rented by Section 8 clients were safe and habitable.

Furthermore, it appears that on the relatively few occasions when there was a request made to OHA or DSS for funds in connection with a rental of one of plaintiffs' properties, the funds were authorized. The County has submitted evidence, which plaintiffs have not rebutted, that during the three years prior to the commencement of this lawsuit (*i.e.*, during the § 1983 limitations period), there were three occasions when a client requested Section 8 assistance from OHA for properties

owned by plaintiffs. All three were approved, and funds were released. There were times when a particular property failed an initial inspection, but plaintiffs were given a chance to, and did, correct the deficiencies, and the funds were released. In addition, OHA stopped payment in one instance after the subject property was condemned by Dansville authorities due to severe plumbing problems, and the tenant left the premises. *See* Dkt. #74-2 Ex. C.

The record also shows that within the three-year limitations period, there was just a single occasion on which DSS required plaintiffs to submit a COC for one of their properties in Dansville, as a condition of DSS's release of funds for a client's security deposit. DSS issued a rent check for the property on the same day that it sent plaintiffs its form security deposit letter, and a security deposit check was issued two weeks later. *See* Dkt. #74-3 ¶ 12.

Plaintiffs have not rebutted that evidence. Michael Oldfield did testify at his deposition that there were times when a prospective Section 8 tenant wanted to move into one of his units but had to wait until a COC could be obtained, *see* Dkt. #78 Ex. E at 598-601, but he did not testify about when that occurred, or give any other specifics, nor did he testify that DSS ever actually denied an otherwise valid request due to the COC requirement. Even if there was an occasional brief waiting period before a COC could be obtained and submitted, that does not demonstrate any constitutional violation.

Thus, plaintiffs' claims against the County fail because of the lack of any causal nexus between the County's actions and any harm allegedly suffered by plaintiffs. Aside from that general defect, plaintiffs' individual claims also fail on the merits because plaintiffs have simply failed to establish a violation of their constitutional rights.

Plaintiffs' due process claim requires plaintiffs to identify a property or liberty interest that is entitled to due process protection. *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 538-39 (1985). "Property interests protected by due process ... are created and their dimensions are defined by existing rules or understandings that stem from an independent source such as state law rules or

understandings that secure certain benefits and that support claims of entitlement to those benefits." *Martz v. Village of Valley Stream*, 22 F.3d 26, 29 (2d Cir. 1994) (internal quotes omitted).

Plaintiffs have not shown the existence of any protected property interest affected by the County's actions, however. Plaintiffs have remained free to rent their properties; the only limitations placed on them by the County arise when Section 8 or DSS clients seek benefits to allow them to rent from plaintiffs. Again, plaintiffs have no standing to assert a claim on behalf of the clients, and plaintiffs have not demonstrated that their own property or liberty interests are at stake. *See Khan v. Bland*, ___ F.3d ___, 2010 WL 5185838, at *14 (7th Cir. 2010) (holding that landlord had no due process liberty interest in continued participation in Section 8 program operated by county housing authority, and noting that plaintiff "could still rent to non-Section 8 housing tenants and participate in other state or government assistance programs"); *see also Roth v. City of Syracuse*, 4 Fed.Appx. 86, 86 (2d Cir. 2001) (noting that federal regulations give housing authorities "considerable discretion to determine which landlords may participate in Section 8 programs," and concluding that landlord "plaintiffs did not show an entitlement to participate in such programs or a property interest sufficient to support their due process claims"); *see also LRL Properties v. Portage Metro Housing Authority*, 55 F.3d 1097, 1110 (6th Cir. 1995) ("since [landlord] plaintiffs had no right to the Section 8 funding, denying them a proper appeal ... does not create in them a property right which can be vindicated in a § 1983 action").

Plaintiffs' equal protection claim fares no better. In order to establish a claim for a violation of their Fourteenth Amendment right to equal protection, plaintiffs must show: (1) that they were treated differently from others who were similarly situated; and (2) that the differential treatment was motivated by discriminatory animus, to punish or inhibit plaintiffs' exercise of constitutional rights, or with a malicious and bad faith intent to cause injury. *See Freedom Holdings, Inc. v. Spitzer*, 357 F.3d 205, 234 (2d Cir. 2004); *Dorcely v. Wyandanch Union Free School Dist.*, 665 F.Supp.2d 178, 194 (E.D.N.Y. 2009).

Plaintiffs contend that the County selectively treated them in two ways. First, they state that the County only required property owners in Dansville and North Dansville to provide proof of current COCs prior to the County's release of funds for security deposits, and that owners of property elsewhere in Livingston County were not subjected to such a requirement. Second, they allege that the County treated other landowners in Dansville differently from them. In particular, they state that David and Barbara Oldfield and Gene Jackson, all of whom own rental property in Dansville, were allowed to have their properties physically inspected annually, in lieu of obtaining a COC each time a tenant vacated the premises.

With respect to the first allegation, plaintiffs have failed to show the existence of any similarly situated owners of property outside of Dansville They have identified no such owners, and there is no evidence that any other municipalities in Livingston County had in place any ordinances similar to Dansville's Code Compliance Law. Absent such an ordinance, any owners of property elsewhere in Livingston County would not have been similarly situated to plaintiffs.[3]

With respect to the three alleged comparators in Dansville–David and Barbara Oldfield and Gene Jackson–the proof shows that DSS *did* require proof of COCs for their properties in Dansville. The only difference between them and plaintiffs, as far as the County is concerned, is that the Dansville CEO, Babbitt, inspected their properties annually, whereas plaintiffs' properties were

---

[3]The County contends that DSS generally required a pre-tenancy inspection to be performed before DSS would release funds for a specific property, but that since Dansville's CEO conducted inspections prior to issuing COCs, DSS decided that proof of a current COC would serve the same functions as a pre-tenancy inspection with respect to properties in Dansville. Apparently, then, owners of Dansville properties had to present proof of a current COC (which would be issued by Dansville following an inspection), while owners of properties outside of Dansville had to submit to an inspection of their properties by DSS. Since to some extent plaintiffs' claims here are based on the allegation that they were forced to submit to warrantless "searches," *i.e.*, inspections, it is curious that they would premise an equal protection claim on the allegation that landowners outside of Dansville were allowed to submit to DSS inspections, rather than having to submit a COC issued by their local municipality. Regardless, absent proof that other municipalities in Livingston County had a code enforcement scheme similar to Dansville's, and that the County did not require the owners of properties in those other municipalities to submit COCs with respect to those properties, plaintiffs cannot demonstrate that other similarly situated landowners were treated more favorably than they were.

inspected whenever there was a change of tenants. Plaintiff himself understood that to be the case; *see* Michael Oldfield Depo. Tr. (Dkt. #74-1 Ex. A) at 652.

After conducting those annual inspections, Babbitt would transmit to the County a list of properties that had passed inspection and been issued a COC for that year. If a DSS client sought financial assistance to help with renting one of those properties, DSS would check the list it had been given by the Village, and if the property was on the list, no further proof of a COC was required by the County. Since plaintiffs' properties were not inspected annually, they were not on that list, and so when DSS got a request for assistance concerning one of those properties, plaintiffs had to take steps to obtain a COC from Dansville, which necessitated a "tenant turnover" inspection by the CEO. Dkt. #74-6 ¶¶ 12-22.

Plaintiffs do not appear to dispute that this is the procedure that was followed, but they contend that "[t]he County ... required plaintiffs to submit to between tenancy inspections[,] but allowed Gene Jackson, David and Barbara Oldfield to have annual inspections." Dkt. #78 ¶ 29. There is no support in the record, however, for the assertion that the *County* played any role in deciding whose properties were inspected annually and whose were inspected between tenants. For whatever reason, the *Village*–not the County–inspected certain properties annually, and others between tenants.[4] Plaintiffs themselves implicitly recognize that fact, stating that "[t]he County accepted the Property Lists [from the Village] knowing that the *Village CEO* did not require David and Barbara Oldfield or Gene Jackson to submit to between-tenancy inspections or obtain a new C of C each time a rental property changed tenancies." Mindy L. Zoghlin Decl. (Dkt. #78) ¶ 30 (emphasis added). The relevant point, however, is that the County required proof of a COC as to all properties in Dansville. The manner and timing of the issuance of those COCs was up to the Village

---

[4]At his deposition, Robert Oldfield testified that he never asked Babbitt if his properties could be inspected annually, because he believed that the Code Compliance Law mandated tenant turnover inspections. Dkt. #74-1 Ex. A at 652-53.

and Babbitt, not the County. In short, no evidence of disparate treatment by the County has been shown here.

As to the Fourth Amendment claim, it bears repeating that the County did not force plaintiffs to subject themselves or their properties to warrantless searches. The County simply required that plaintiffs either consent to allow their properties to be inspected, or, in lieu of a DSS inspection, to produce proof of a current COC issued by the Village for their Dansville properties, before OHA or DSS would release funds on behalf of prospective tenants. These were not involuntary, warrantless searches, but simply a condition (and a reasonable one, at that) of the release of funds for Section 8 or DSS clients who wished to rent from plaintiffs. There was no threat by the County of any criminal penalties if plaintiffs refused or failed to meet these requirements; the only consequence would be that the agency would not authorize the payment of funds. That does not give rise to a Fourth Amendment violation. *See Wyman v. James*, 400 U.S. 309 (1971) (home visits by a caseworker made pursuant to the administration of the Aid to Families with Dependent Children program were not searches, in part because a home visit, even given its investigative aspect, could not be "equated with a search in the traditional criminal law context"); *Sanchez v. County of San Diego*, 464 F.3d 916, 921-23 (9th Cir. 2006) (warrantless home visits that county conducted as condition of eligibility for state welfare recipients were not "searches" for Fourth Amendment purposes, in part because "there [wa]s no penalty for refusing to consent to the home visit, other than denial of benefits," and, even if the home visits were searches under the Fourth Amendment, they were reasonable), *cert. denied*, 552 U.S. 1038 (2007).

That DSS chose, in the case of Dansville properties, to rely on the Village's COCs rather than conduct its own inspections, is of no real moment, insofar as plaintiffs' claims against the County are concerned. Regardless of who conducted the inspections, I see no basis for a Fourth Amendment claim against the County. *See* New York State Office of Temporary & Disability Assistance, Temporary Assistance Source Book (Dkt. #88-5 Ex. A) chap. 17, § A(3)(b) (stating that "[l]ocal districts must conduct or arrange for a pre-move and post-move inspection," and that "[i]t is

acceptable to devise alternate means to the personal inspection of the premises by a local district official," including "[i]nspections conducted by local code enforcement agencies ...").[5]

Plaintiffs' First Amendment claim against the County is, if possible, even weaker. Where a private citizen asserts a First Amendment claim against a municipality, the plaintiff must demonstrate that: (1) the plaintiff engaged in speech or conduct protected by the First Amendment; (2) the defendant's actions were motivated by the exercise of the plaintiff's First Amendment rights; and (3) the defendant's actions effectively chilled the plaintiff's exercise of those rights. *See Williams v. Town of Greenburgh*, 535 F.3d 71, 76 (2d Cir. 2008) (citing *Curley v. Village of Suffern*, 268 F.3d 65, 73 (2d Cir. 2001)); *Casciani v. Nesbitt*, 659 F.Supp.2d 427, 459 (W.D.N.Y. 2009), *aff'd*, 2010 WL 3467094 (2d Cir. 2010); *Moran v. City of New Rochelle*, 346 F.Supp.2d 507, 517 (S.D.N.Y. 2004).

Plaintiffs' First Amendment claim is based on Michael Oldfield's complaints to *Dansville* about the Code Compliance Law, and his assertion that it was unconstitutional under *Sokolov*. While a plaintiff's protected activity, for purposes of a First Amendment retaliation claim, need not consist of complaints *to the defendant* on that claim, there is simply no evidence here that the County took any action against plaintiffs on account of Oldfield's complaints to Dansville officials, or that the County harbored any animus toward plaintiffs as a result of those complaints.

Perhaps in implicit recognition of these defects, plaintiffs' brief in opposition to defendants' motion does not even address the First Amendment claim, other than to note that it has been

---

[5]As the lessors, with prospective tenants ready to move in, plaintiffs also would have had a significantly diminished expectation of privacy in the premises, which necessarily would have been accessible to the tenants as soon as they moved in. *See Ambrose v. Unicoi County, Tennessee*, No. 2:08-CV-253, 2010 WL 3861069, at *6 (E.D.Tenn. Sept. 24, 2010) (concluding that landlord did not have reasonable expectation of privacy in common hallway area of apartment building); *Range v. Brubaker*, No. 3:07 CV 480, 2009 WL 3199175, at *7 (N.D.Ind. Sept. 25, 2009) ("it is well established that a landlord does not have a reasonable expectation of privacy with respect to property that he has rented to a tenant, and that is occupied by that tenant").

asserted. *See* Dkt. #81 at 5. Plaintiffs' First Amendment claim against the County is therefore dismissed.

**II. The County's Counterclaim**

In its counterclaim, the County alleges that it paid security deposits to plaintiffs for rental housing units on behalf of DSS's clients, and that in breach of plaintiffs' agreements with the County, plaintiffs have retained over $12,000 in such security deposits, without providing to the County any statement indicating that the client owed back rent or that the client had caused physical damage to the property. The County seeks recovery of the withheld funds. Dkt. #44 ¶¶ 170-79.

Plaintiffs have cross-moved for summary judgment dismissing this counterclaim. (Dkt. #77.) In support of the motion, plaintiffs contend that the County has failed to produce sufficient evidence to support this counterclaim. *See* Dkt. #81 at 20-22.

By letter to the Court (Dkt. #91), plaintiffs' counsel has stated that after reviewing the County's response to plaintiffs' cross-motion, they "now understand that Livingston County does not oppose plaintiff's request to depose County witnesses to address the accounting records produced in connection with the County's counterclaim," and that "[c]onsequently, plaintiffs have authorized me to withdraw their motion for summary judgment dismissing the County's counterclaim ... ."

In a responding letter (Dkt. #92), counsel for the County argues that plaintiffs' "purported justification for the withdrawal [of their cross-motion] is simply a pretext because they have no defense for their failure to return security deposits in this case." Defense counsel states that "[i]f the Court decides to treat" the letter from plaintiffs' counsel as a motion to withdraw [plaintiff's] cross-motion, then it should also award the County all of its costs including attorneys' fees." Plaintiffs' counsel has replied by way of another letter (Dkt. #95), taking issue with several of the assertions made in defense counsel's letter, and opposing the County's request for costs and attorney's fees.

The Court will permit plaintiffs to withdraw their cross-motion, and will deem that motion to be withdrawn. I also deny the County's request for costs and attorney's fees at this time.

Contrary to defense counsel's statement in his letter to the Court that the County "invited the Court to search the record and grant it summary judgment as to liability on the counterclaim," the County's response to the counterclaim stated only that "[t]he County [wa]s *tempted* to ask the Court to 'search' the record and enter judgment on liability in favor of the County on the counterclaim." Dkt. #88-12 at 5 (emphasis added). In any event, I decline such an invitation. While there does appear to be some support in the record for the County's allegations concerning the unreturned security deposits, it is not clear at this point whether the record before me is adequate and complete as to that issue. If the County believes that the undisputed facts entitle it to summary judgment on this matter, it may formally move for summary judgment in its favor. I also am not convinced that an award of costs or attorney's fees is warranted at this juncture, and I deny the County's request in that regard.

## CONCLUSION

The motion for summary judgment filed by Livingston County (Dkt. #74) is granted, and plaintiffs' claims against Livingston County (the fifth, ninth, thirteenth, sixteenth, and twentieth causes of action in the Second Amended and Supplemental Verified Complaint, Dkt. #42) are dismissed.

Plaintiffs' cross-motion for summary judgment dismissing Livingston County's counterclaim (Dkt. #77) is deemed withdrawn and is denied without prejudice.

IT IS SO ORDERED.

_____
DAVID G. LARIMER
United States District Judge

Dated: Rochester, New York
January 18, 2011.